**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

HARTFORD CASUALTY                    NO. 1:10-CV-617
  INSURANCE CO.

                                    JUDGE CONNER
v.

                                    MAGISTRATE JUDGE METHVIN
ACC MEAT CO., LLC

v.

CHRISTIAN BAKER CO.

**REPORT AND RECOMMENDATION**
**ON MOTIONS FOR SUMMARY JUDGMENT**
(**Docs. 27**, **30**)

      Hartford Casualty Insurance Company filed this diversity action for

declaratory judgment on September 7, 2010 under 28 U.S.C. §1332 and the

Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*. Named as defendant

is ACC Meat Company, LLC., which subsequently filed a third party complaint

against insurance broker Christian-Baker Co. (Doc. 18).[1]

      Hartford seeks a declaratory judgment that ACC was not insured under any

Hartford policy, and therefore Hartford owes no defense or indemnity in

connection with a lawsuit filed by Mario Gonzalez against ACC and several

others, alleging that Gonzalez' jacket was caught in a canning machine owned by

ACC, pulling him into the machine and causing serious injuries to his left hand

---

[1] The third party complaint brings three causes of action against C-B: declaratory
judgment (Count I), negligence (Count II) and breach of contract (Count III).

2

and arm. The lawsuit has since been settled, and the sole remaining issue is whether Hartford is required to indemnify ACC for the costs of defense and any settlement paid.[2]

Before the court are cross motions for summary judgment filed by Hartford[3] and ACC.[4] The motions have been referred to the undersigned for a report and recommendation and are now ripe for disposition.[5]

---

[2] *Gonzalez, et al. v. Angelus Sanitary Canning Machine Co.*, MDPA Civil Action No. 1:09-cv-1455.

[3] Hartford filed a motion for summary judgment on May 6, 2011. (Doc. 27), along with a supporting brief and a statement of material facts. (Docs. 28, 29). Christian Brothers filed a response, a brief in opposition and a counter-statement of material facts on May 27, 2011. (Docs. 34, 35, 36). ACC also filed its response, opposition brief and counter-statement of material facts on May 27, 2011 (Docs. 37, 38, 39). Hartford filed a reply brief on June 17, 2011. (Doc. 47).

[4] Defendant ACC filed an amended motion for summary judgment, supporting brief and statement of material facts on May 17, 2011 (Docs. 30, 31, 32). Hartford filed its response to the statement of facts and a brief in opposition on June 17, 2011 (Docs. 46, 48). Christian Brothers filed documents captioned as a response to that motion and an answer to the statement of facts on June 17, 2011 (Docs. 44, 45). However, both documents appear to be responses to statements of fact, as neither is styled as a brief. Moreover, with 30 numbered paragraphs, Doc. 45 seems to correlate to ACC's statements of fact, also 30 numbered paragraphs in length. It is unclear to what Document 44 responds or correlates.

[5] On October 14, 2011, Judge Conner referred the present motions to the undersigned. (Doc. 49).

3

## FINDINGS AND RECOMMENDATIONS

### I. Background

Hartford is an company organized under the laws of the state of Indiana with a principal place of business in Hartford, Connecticut. (Doc. 1, ¶ 1). During the period in question, Hartford had issued a policy of general liability insurance to Brother & Sister Food Company, a New Jersey corporation engaged in the business of processing and packaging meat in Harrisburg, Pennsylvania. (Docs. 24-1, p. 3 (deposition p. 11)). The sole shareholders of B&S are Aziz Sahovic and Vedad Sahovic. (Docs. 31, 45, 46 ¶ 6)

Defendant ACC is a Pennsylvania limited liability company with its principle place of business located in Harrisburg, PA. (Docs. 29, 35, 38 ¶ 1). ACC filed a certificate of organization with Pennsylvania's Department of State on January 8, 2007, with an effective date of December 15, 2006. (*Id*. at 13; Doc. 29, Ex. F). The owners of ACC are Aziz Sahovic, Vedad Sahovic and Davor Skobic. (Docs. 29, 35, 38 ¶ 12).[6] The only assets of ACC were certain canning machines (Vedad Sahovic deposition, Exh. K, Doc. 29, 12:23 - 13:7).

---

[6] An additional shareholder, John Zdunic, sold his interest in ACC to the Sahovics on December 13, 2008, two days before Gonzalez was injured. (Docs. 31, 45. 46 ¶ 7). This resulted in the Sahovics owning 75% of interest in ACC stock. (Doc. 31, ¶ 8).

4

The accident involving Gonzalez occurred on December 15, 2008. Gonzalez was an employee of B&S who was operating a canning machine owned by ACC. B&S was the only named insured on the general liability policy in effect at the time of the accident. (*Id*. at ¶ 7; Doc. 29, Ex. C). The policy was originally issued on December 31, 2006, for one year, but had been renewed for an additional year, expiring on December 31, 2008. (*Id*. at ¶ 7; Doc. 29, Ex. C). On September 26, 2008, Hartford notified B&S that the policy would not be renewed upon its expiration. (Docs. 29, 35, 38 ¶ 20)

Christian-Baker Company ("C-B") is an independent insurance agency authorized to sell insurance on behalf of multiple insurers, including Hartford. (Docs. 29, 35, 38 ¶ 18). James Pace is a partner and vice president at C-B. (*Id*. at ¶ 17). Pace first procured insurance for B&S in 2005. (*Id*. at ¶ 19).

Aziz Sahovic testified that Pace knew about the existence of ACC as early as 2007 (Doc. 30, ¶ 36); that he met with Pace in October, 2008 and again in December, 2008 and the two discussed whether to add ACC to the B&S policy or to secure separate coverage, but that Pace recommended adding ACC to the policy. (Doc. 31, ¶¶ 25–27). According to Pace's testimony, he first learned of the existence of ACC in December, 2008, but he did not know that ACC was a separate entity—believing instead that B&S was simply "doing business as" ACC

(Doc. 29-9, Ex. H, Pace deposition, p. 56:3–19; 71:4–12).[7] Pace also understood

that ACC would not begin any operations until after January 1, 2009. (Docs. 29,

35 at ¶ 23). Pace testified that it was not until June 9, 2010 that he became aware

that ACC was a separate legal entity. (*Id*. at ¶ 27).

## II. Issues Presented

Hartford seeks summary judgment declaring that ACC is not covered by the

insurance policy for B&S in effect at the time of the accident. (Doc. 27)

ACC seeks summary judgment finding Hartford owes coverage and a

defense to ACC in the *Gonzalez* action on two grounds: 1) because ACC was an

unnamed subsidiary under the B&S policy (Doc. 30, pp. 3-4); and/or 2) Hartford

should be estopped from denying coverage under the B&S policy because of

discussions between Aziz Sahovic and James Pace, vice president of Hartford's

agent, C-B, regarding coverage for ACC prior to the Gonzalez accident (*Id*., pp.5-

9).

---

[7] Although ACC submits that Pace knew about ACC as far back as 2007, and that he was
informed of ACC's desire to obtain insurance coverage in October, 2008, inasmuch as
ACC is also moving for summary judgment, the facts must be viewed in a light most
favorable to C-B, as the non-movant. As it discussed later, this disputed fact is not
material and has no bearing on the outcome of the motions.

6

The motions raise the following issues for summary judgment:

1. Does the policy provide coverage to ACC as an additional insured?

2. In the alternative, does ACC have coverage under any alternative theory?

## III. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

7

When determining whether there is a genuine dispute of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid or obtain summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed. R. Civ. P. 56(c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir.

1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed. R. Civ. P. 56(e).

## IV. Discussion

### (A) Standard for interpretation of insurance policies

Canons of construction for insurance polices are well established. The interpretation of an insurance policy is solely a question of law within the court's province. *Geisler v. Motorists Mut. Ins. Co.*, 556 A.2d 391, 393 (Pa. Super. Ct. 1989) (citing *Winters v. Erie Ins. Group*, 532 A.2d 885, 887 (Pa. Super. Ct. 1987)). The court's primary consideration in performing this function is "'to ascertain the intent of the parties as manifested by the language of the written instrument.'" *Home Ins. Co. v. Law Offices of Jonathan DeYoung*, 32 F. Supp. 2d 219, 223 (E.D. Pa.1998) (quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563, 566 (1983)). The policy must be read as a whole and construed in accordance with the plain meaning of terms. *C.H. Heist Caribe Corp. v. Am. Home Assurance Co.*, 640 F.2d 479, 481 (3d Cir.1981).

The terms of the insurance policy must be given their "plain and proper meaning" whenever possible. *Monti v. Rockwell Ins. Co.*, 450 A.2d 24, 25 (Pa.

Super. Ct. 1982) (citing *Ranieli v. Mut. Life Ins. Co. of Am.*, 413 A.2d 396 (Pa.

Super. Ct. 1979)). If a word or phrase is specifically defined in the policy, that

definition controls. *Peerless Dyeing Co. v. Indus. Risk Insurers*, 573 A.2d 541,

544 (Pa. Super. Ct. 1990). Words of common usage must be "construed in their

natural, plain, and ordinary sense, with a court free to consult a dictionary to

inform its understanding of terms." *Melrose Hotel Co. v. St. Paul Fire & Marine

Ins. Co.,* 432 F. Supp.2d 488, 495 (E.D. Pa.2006) *(citing Madison Constr. Co. v.

Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 108 (1999)).

　　If a contractual term is undefined, and has no single "plain and proper

meaning" such that the term is "reasonably susceptible of different constructions

and capable of being understood in more than one sense," then it may be

considered ambiguous. *401 Fourth Street, Inc. v. Investors Ins. Group*, 583 Pa.

445, 879 A.2d 166, 171 (Pa. 2005) (quoting *Madison Const.,supra* at 106 ).

However, "the mere fact that the parties do not agree upon the proper

construction" of a term does not render the term ambiguous. *J.C. Penney Life Ins.

Co. v. Pilosi*, 393 F.3d 356, 364 (3d Cir. 2004) (quoting *State Farm Fire & Cas.

Co. v. MacDonald*, 850 A.2d 707, 710 (Pa. Super. Ct. 2004)). But if a genuine

ambiguity arises, it is to be resolved in favor of the insured. *401 Fourth St.*, 879

A.2d at 171 (citing *Gene & Harvey Builders, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 517

A.2d 910, 913 (Pa. 1986)). Resolving in the insured's favor not only furthers "the contract's prime purpose of indemnification," but also follows the general rule that contractual ambiguities are to be construed against the drafter, *Lane v. Commonwealth*, 954 A.2d 615, 619 (Pa. Super. Ct. 2008) (citing *Bucks Orthopaedic Surgery Assocs., P.C. v. Ruth*, 925 A.2d 868, 871 (Pa. Super. Ct. 2007)), and recognizes that insurance polices are generally contracts of adhesion in which the insured has little or no bargaining power, indicating that the insurance policy should be construed strictly against the insurer, *Burton v. Republic Ins. Co.*, 845 A.2d 889, 898 (Pa. Super. Ct. 2004) (citing *Ferguson v. Lakeland Mut. Ins. Co.*, 596 A.2d 883 (Pa. Super. Ct. 1991)).

### (B) Was ACC an additional insured covered under B&S's policy?

There is no dispute that ACC is not a named insured on the B&S policy issued by Hartford. ACC contends, however, that it was an additional insured under alternate theories: (1) that it is a subsidiary of B&S; (2) that, in forming ACC, the Sahovics were acting as shareholders in B&S; and/or (3) that it is covered under the B&S policy based on the indemnity agreement between them.

Under Pennsylvania law, an insurance policy only benefits the parties to the contract or the named insured. *Banos v. State Farm Insurance Company*, No. 07-2783, 2007 WL 2972600, at *3 (E.D. Pa. Oct. 10, 2007). Furthermore, the terms of

11

the contract determine whether an insurer is obligated to an individual. *McDivitt v.*

*Pymatuning Mutual Fire Insurance Company*, 303 Pa. Super. 130, 134–135, 449

A.2d 612, 614–615 (Pa. Super. Ct. 1982).

> *1. Is ACC covered under the policy as a subsidiary?*

The policy at issue defines the term "unnamed subsidiary" as:

> Any subsidiary and subsidiary thereof of yours which is a legally
> incorporated entity of which you own a financial interest of more that
> 50% of the voting stock on the effective date of this Coverage Part.

(Doc. 29-3, Ex. C, p. 71). Hartford argues that ACC is not an unnamed subsidiary

not only because it lacks a parent corporation but also because common ownership

between B&S and ACC is insufficient to establish the latter as a subsidiary of the

former.

Black's Law dictionary defines a subsidiary corporation as an entity "in

which a parent corporation has a controlling share." BLACK'S LAW DICTIONARY

(9th ed. 2009). Defendants contend that a broader definition of subsidiary should

be applied, as the policy does not define "subsidiary" and, further, does not

reference "subsidiary corporation" specifically. They contend the term

"subsidiary" can also mean one under another's control, and does not require a

parent. However, this argument is unavailing.

12

This court has interpreted the term "subsidiary" in an insurance policy in accordance with Black's definition of "subsidiary corporation." *See Mallalieu-Golder Ins. Agency, Inc. v. Executive Risk Indem.*, No. 4:CV-03-1155, 2006 WL 2322396 (M.D. Pa. Aug. 9, 2006). Although the policy at issue in that case, like here, referenced only the term "subsidiary," it was interpreted as a "subsidiary corporation." *Id*. Indeed, as the instant policy defines "unnamed subsidiary" to be a "subsidiary . . .which is legally incorporated," there is no arguable claim that this B&S policy did not intend the term "subsidiary" to refer to a "subsidiary corporation."

ACC concedes that B&S owns no part of ACC, and that ACC is an L.L.C. and has no parent company or corporation. (Docs. 29, 38 ¶ 11; Doc. 29, Ex. D; Doc, 29, Ex. E, p. 6). Accordingly, ACC could not be a subsidiary corporation as that term is defined in Black's Law Dictionary.

For the foregoing reasons, it is recommended that the court grant summary judgment in Hartford's favor, finding that ACC is not covered under the Hartford policy as a subsidiary of B&S.

*2. Were the Sahovics acting as officers of B&S in forming ACC?*

ACC also contends that given the common ownership and control between B&S and ACC, the policy should be construed as extending coverage to ACC. In

support of this position, ACC makes the additional argument that there is a question of fact as to whether its majority shareholders, the Sahovics, were acting within their capacity as officers for B&S in forming ACC. If so, the policy could be construed as extending coverage to ACC because the Hartford policy insures the acts and omissions of officers of B&S.

The Sahovics are the sole owners of B&S, and own 75% of ACC. However, B&S did not form or acquire ACC; rather, at the time it was created, the Sahovics had a 50% ownership in ACC, with additional 25% shares owned by Skobic and Zdunic, the latter of whom sold his shares to the Sahovics two days before Gonzalez's accident. ACC is presently owned by the Sahovics and Skobic. (Doc. 38, ¶ 12). The policy cannot be read to cover the acts of the Sahovics in forming ACC any more than it could be read to extend coverage to Skobic or Zdunic.

Additionally, the common ownership argument in support of extending coverage ignores not only the operating terms of the insurance policy but also controlling case law as to subsidiaries. Accordingly, the common ownership of the two entities cannot create coverage under the policy with Hartford.

14

3. *Is ACC covered under the B&S policy based on the indemnity agreement between them?*

ACC contends that it is covered under the Hartford policy in light of the operating agreement between ACC and B&S.[8] Under the agreement, B&S employees would produce the product for ACC, and allegedly B&S would assume liability for ACC with respect to the production and marketing of ACC products. At the least, ACC argues, the existence of the operating agreement raises a question of fact as to the scope of coverage, which precludes summary judgment in favor of Hartford.

Even if ACC were somehow construed as an insured under the policy, the policy itself excluded coverage for "bodily injury." The exclusions included:

b.  Contractual Liability

> (1) "Bodily injury" or "property damage" or

> (2) "Personal or advertising injury"

for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

---

[8] Aziz Sahovic testified to the substance of the operating agreement between B&S and ACC.  It included, *inter alia*, authorizing the Sahovics to act on behalf of ACC and providing that B&S would assume liability in connection with its production process. The operating agreement also granted a license to ACC to use the B&S name in marketing ACC products, allowed ACC to use B&S equipment without charge and provided that B&S employees would be used for ACC's production. *See* Doc. 29, Ex. J.

15

This exclusion does not apply to liability for damages because of

> (a) "Bodily injury" . . .that the insured would have in the absence of the contract or agreement; or

> (b) "Bodily injury" . .  assumed in a contract or agreement that is an "insured contract," provided that the "bodily injury" . . . occurs subsequent to the execution of the contract.

*See* Business Liability Coverage Form (Doc. 29-3, p. 63–64).

Another exclusion applying to injured employees provides as follows:

e. "Bodily injury" to

(1) An "employee" of the insured arising out of and in the course of:

> (a) Employment by the insured; or

> (b) Performing duties related to the conduct of the insured's business, [.]

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract."

*Id*. at 64.

16

The exclusion does not apply for liability assumed under an "insured contract." The policy defines an "insured contract" to include:

b.      A sidetrack agreement

c.      Any easement or licensing agreement [.]

f.      That part of any other contract or agreement pertaining to your business . . . under which you assume tort liability of another party to pay for "bodily injury" . . . to a third party or organization, *provided that the "bodily injury" . . . is caused, in whole or in part, by you or those acting on your half[.]*

(Doc. 29-3, Ex. C, p. 81). Under the italicized language above, any liability for bodily injury must be causally related to actions of "you or those acting on your behalf," — e.g., actions of B&S or B&S employees or officers. Gonzalez himself was a B&S employee, and his allegations of liability against ACC were not premised upon any actions of B&S or its agents, but rather upon ACC's ownership and failure to repair/maintain a safety guard on the canning/sealing equipment which injured him. Accordingly, the B&S policy affords no coverage even if ACC were found to be an insured under the policy.

Further, even if the agreement between B&S and ACC qualifies as an "insured contract," this is not sufficient to confer third-party beneficiary status to ACC under the policy. Standing alone, an "insured contract" provision does not demonstrate the explicit intent necessary to confer third-party beneficiary status.

17

*Tremco, Inc. v. Manufacturers' Ass'n Insurance Co.*, 832 A.2d 1120, 1121–22 (Pa. Super. Ct. 2003) (finding that, although the plaintiff's contract with the roofing contractor was an "insured contract" as defined in the policy between the contractor and its insurer, which thereby obligated the insurer to afford coverage for the "insured contract," the plaintiff could not proceed directly against the insurer as a third-party beneficiary of the insurance policy because no other language in the policy explicitly conferred third-party beneficiary status). ACC is therefore unable to proceed directly against the Hartford. *Id*; *York International Group v. Cincinnati Ins. Co.*, Civil A. No. 06-4778, 2007 WL 2667984 (E.D. Pa. 2007) (fact that policy contains an "insured contract" clause does not manifest sufficient intent to confer third-party beneficiary status upon party with whom named insured had an indemnity agreement).

Thus, even if there were an indemnification agreement between B&S and ACC, Hartford's only obligation under the policy is to indemnify its insured, B&S, against any claims brought by against it by ACC. Neither in this case nor in any related actions has ACC sought indemnification by B&S pursuant to the licensing agreement or the operating agreement between the two. Consequently, the indemnification clause in the B&S policy is inapplicable to this case.

18

### (C) Was anything done outside of the insurance contract to bind Hartford?

ACC contends that Hartford's agent, C-B, failed to procure insurance for ACC, and that any negligence attributable to C-B in failing to secure insurance for ACC can be ascribed to Hartford. Hartford argues, however, that the elements of a negligence claim have not been established and, moreover, that there is not a principal-agency relationship between it and C-B such that the former would be liable for the negligent acts of the latter.

#### 1. Elements of negligence claim

"In any case sounding in negligence, a Hartford must demonstrate: (1) a duty of care; (2) the breach of the duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the plaintiff." *Farabaugh v. Pa. Turnpike Com'n*, 911 A.2d 1264, 1272-73 (Pa. 2006). With respect to the first element, defendants must establish that Hartford had a direct or a vicarious duty of care to ACC. The parties do not dispute that Hartford had no direct knowledge of the existence of ACC prior to the accident that caused Gonzalez injury and, therefore, it was not aware of the existence or relationship of ACC to B&S. The parties dispute, however, whether Pace's knowledge of ACC can be imputed to Hartford.

19

C-B contends that Pace was first informed of the existence of ACC in December, 2008. ACC argues, however, that Pace was informed of ACC and its need of insurance coverage in October, 2008. Thus, there is a dispute as to when ACC first contacted Pace to obtain insurance coverage.[9] There is no disagreement, however, that ACC represented to C-B and Pace that its operations would not commence until January, 2009. (Docs. 29, 35 at ¶¶ 23, 24; Doc. 29-9, Ex. H, deposition p. 63:23–64:3; 100:9–12). Regardless of whether C-B had knowledge of ACC in October, 2008 or in December, 2008, the relevant inquiry is whether C-B's knowledge can be imputed to Hartford to establish a vicarious duty owed by Hartford to ACC.

The negligence of an independent contractor agent or broker can, at times, be imputed to the insurer. *See generally Eddy v. Republic Nat'l Life Ins. Co.*, 290 N.W.2d 174, 177 (Minn.1980) (insurance company is only liable for the torts of its agents). It is first necessary to determine on whose behalf Pace, as the broker, was acting when he performed the alleged negligent act, *to wit*., failing to properly procure insurance for ACC. To resolve this issue, the authority of C-B must be examined to determine whether C-B can be considered an agent of Hartford. If so, Hartford may be vicariously liable for the actions of C-B, and specifically Pace, in

---

[9] As noted above, however, this disputed fact is not material.

allegedly failing to secure coverage for ACC. *See De Lage Landen Financial Services, Inc. v. Rasa Floors, LP,* 792 F. Supp. 2d 812, 843 (E.D. Pa. 2011) (court declined to find purported fraudulent conduct imputed under theory of agency absent evidence of an agency relationship).

   *2. Agency*

   "The basic elements of agency are 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" *Scott v. Purcell*, 490 Pa. 109, 415 A.2d 56, 60 (Pa. 1980) (quoting the Restatement (Second) of Agency § 1, Comment b (1958)). With regard to the existence of an agency relationship, under Pennsylvania law, the liability of a principal to third parties for the act of an agent must rest upon (1) express authority, which is that which is directly granted; (2) implied authority, which is the right and obligation to do all that is proper, usual, and necessary to the exercise of authority actually granted; (3) apparent authority, which arises where the principal holds one out to be an agent by the principal's conduct; or (4) agency by estoppel. *Reifsnyder v. Dougherty*, 301 Pa. 328, 152 A. 98, 100 (1930). Although the question of whether a principal-agent relationship exists is ordinarily one of fact for the jury, where the facts giving rise to the relationship are not in dispute,

21

the question is one which is properly decided by the court. *See Breslin by Breslin v. Ridarelli*, 308 Pa. Super. 179, 454 A.2d 80, 82 (1982), citing *Juarbe v. City of Philadelphia*, 288 Pa. Super. 330, 431 A.2d 1073, 1076 (1981).

Under Pennsylvania law, merely acting as a broker in seeking insurance which is assigned pursuant to an assigned risk plan does not constitute an agency relationship between the insurance agency and the carrier to whom the policy is assigned. The Pennsylvania Superior Court has held that agency contracts alone are not sufficient to establish the agency between a broker and an insurer. *Kairys v. Aetna Cas. & Sur. Co.*, 314 Pa. Super. 502, 461 A.2d 269, 273 (1983). Indeed, the Pennsylvania Supreme Court has held that an insurance broker is considered the agent of the insured when the insured employs a broker to choose an insurer. *Taylor v. Crowe*, 444 Pa. 471, 282 A.2d 682, 683 (1971).

> Where a person desiring to have his property insured applies not to any particular company or its known agent, but to an insurance broker, permitting him to choose which company shall become the insurer, a long line of decisions has declared the broker to be the agent of the insured; not of the insurer.

*Id*. (quoting *Taylor v. Liverpool & L & G Ins. Co.*, 68 Pa. Super. 302, 304 (1917)); *see also Fisher v. Aetna Life Ins. & Annuity Co.*, 39 F. Supp.2d 508, 514 (M.D. Pa. 1998) *aff'd*, 176 F.3d 472 (3rd Cir.1999) (where a broker is not employed by the insurance company, acts as the middle man between the insurance company and

the insured, and solicits the public and then "places the requested insurance with a company," the broker is an agent of the insured) (internal citations and quotations omitted).

Additionally, a prior relationship between a broker and the insured may suggest that a broker is the insured's agent. *See Rich Maid Kitchens, Inc. v. Pennsylvania Lumbermens Mut. Ins. Co.,* 641 F. Supp. 297, 304 (E.D. Pa. 1986). In order for a broker to be an agent of an insurer, there must be some evidence demonstrating authorization by the insurer or facts from which a reasonable inference may be made. *Taylor, supra* at 683-684. The ability to bind an insurer is not sufficient to establish authorization. *See Comcast Spectator LP v. Chubb & Son, Inc.*, Civ. A. No. 05-1507, 2006 WL 2302686, *17 (E.D. Pa. Aug. 17, 2006). Where an insured is aware that a broker is not bound to a particular insurance carrier but solicits insurance from several different insurers, the general rule established in *Taylor*, not the exceptions thereto, applies. *Regis Ins. Co. v. All American Rathskeller*, Inc., 976 A.2d 1157, 1169 (Pa. Super. Ct. 2009).

Furthermore, a broker may be an agent of an insured for some purposes and an agent of an insurer for others. *Fisher,* 39 F. Supp.2d at 514. Thus, the agency status of a broker depends on the relationship between the broker and the insured as well as that between the broker and the insurer. The burden of showing

authority to act for another "lies on the person who avails himself of such acts in order to charge a third person as principal . . . and he must also show that he knew of the acts or conduct of the supposed agent at the time he relied on them." *Reifsnyder, supra*; *see also Volunteer Fire Co. of New Buffalo v. Hilltop Oil Co.*, 412 Pa. Super. 140, 602 A.2d 1348, 1351 (1992) (noting that, under Pennsylvania law, the party asserting an agency relationship has "the burden of proving it by a fair preponderance of the evidence.").

> *a. Actual authority*

C-B contends that the Agency Agreement, which permits C-B to solicit insurance and provide customary services to insureds, is evidence of the existence of an agency relationship. Alternatively, it claims that the Agency Agreement creates a factual question as to C-B's authority, precluding summary judgment in favor of Hartford.

C-B cites *Sands v. Granite Mut. Ins. Co.*, 232 Pa. Super. 70, 331 A.2d 711 (Pa. Super. Ct. 1974) to support its position. In *Sands*, the plaintiff went to an insurance broker with whom he had previously dealt to obtain auto insurance. The plaintiff indicated that he desired to be fully insured, and since the broker was familiar with the plaintiff, the broker had the plaintiff sign a blank insurance application, leaving the broker to fill in all of the necessary information. Although

24

the broker accepted the premium payment and placed the insurance with the

defendant, Granite Mutual Insurance Company, the broker failed to obtain

uninsured motorist coverage for plaintiff. Plaintiff paid all premiums on the policy

directly to the broker, who also processed a renewal of the policy for plaintiff. The

broker subsequently failed to forward plaintiff's renewal application and premium

payments to the insurance company. Plaintiff discovered the broker's default when

he was injured in an automobile accident involving an uninsured motorist and

sought payment under the policy.

A divided panel of the Pennsylvania Superior Court concluded that the

insurance broker had authority to bind the insurer based on the following facts: (1)

in two previous insurance policies, the insurer did not approve the policies until

several weeks after coverage purportedly began; (2) the insurance policy listed the

broker as both an "authorized representative" and a counter-signatory of the

insurance, and documentary evidence indicated the authorized representative

could bind the insurer; (3) the broker was permitted to set insurance rates—a

privilege no other broker enjoyed with this insurer—and deduct commissions

directly from premium payments as the broker received them; and (4) the insurer

and the broker both submitted an application to the Insurance Commissioner of the

Commonwealth to license the broker as an agent of the insurer. *See id.* at 715.

25

However, subsequent holdings make clear that collecting a premium,

remitting a premium and deducting commissions directly from that premium are

insufficient to make one an agent of the insurer, especially where the insured did

not request that his insurance be placed with any particular company. *See Comcast*

*Spectator LP, supra; Kairys*, 461 A.2d at 276; *Rich Maid*, 641 F. Supp. at 305

(evidence that insurance agent collected premiums from insured did not make him

agent of insurer). Thus, although the Agency Agreement provides, *inter alia*, that

C-B may solicit, quote and provide customary insurance services, this fails to

overcome the presumption in this Commonwealth that the broker is the agent of

the insured, not the insurer. *See Hawthorne v. American Mortg., Inc.*, 489 F.

Supp.2d 480 E.D. Pa. 2007) (under Pennsylvania law, general rule for insurance

cases is that the broker is the agent of the insured who purchases insurance, not the

agent of the insurer who issues it); *Transguard Ins. Co. of America, Inc. v.*

*Hinchey*, 464 F. Supp.2d 425 (M.D. Pa. 2006) (existence of an agency contract

between a broker and an insurer, that merely described manner in which broker

was to conduct business with insurer and that contract could be canceled by either

party, did not make broker agent of insurer under Pennsylvania law for all

purposes); *Donegal Mut. Ins. Co. v. Grossman*, 195 F. Supp.2d 657 (M.D. Pa.

2001) (acting as a broker in seeking insurance which is assigned pursuant to an

assigned risk plan does not constitute an agency relationship between the insurance agency and the carrier); *Fisher, supra* at 508 (under Pennsylvania law, insurance broker who sold life insurance policies for at least five different insurers, was an agent for the insureds rather than an agent for the insurer where insureds asked broker to find them a policy rather than asking for insurer's policy specifically); *Regis Ins. Co. v. All American Rathskeller, Inc*., 976 A.2d 1157 (Pa. Super. Ct. 2009) (distinguishing the "unique relationship" between the broker and the insured in *Sands*). Additionally, the prior relationship between the Sahovics and Pace suggests that C-B is the their agent and acting on their behalf. *See Rich Maid*, 641 F. Supp. at 304 (fact that broker had personal relationship with the insureds for many years indicated that he was their agent, not the insurer's).

Consequently, the facts do not establish that C-B had actual authority to bind Hartford outside of the scope of the policy.

### b. Apparent authority

Apparent authority is the "power to bind a principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted," for instance where "the principal knowingly permits the agent to exercise such power or if the principal holds the agent out as possessing such power." *Revere Press, Inc. v. Blumberg*, 431 Pa. 370, 246 A.2d

407, 410 (Pa.1968). Pennsylvania courts have described the test for such authority as "whether a man of ordinary prudence, diligence and discretion would have a right to believe and actually believe that the agent possessed the authority he purported to exercise." *Apex Financial Corp. v. Decker*, 245 Pa. Super. 439, 369 A.2d 483, 486 (1976) (citation omitted).

Defendants argue that Hartford has created an inference of authority by referring to C-B as its "agent," as well as permitting C-B to collect premiums and cancel policies. These acts, they suggest, establish apparent authority of C-B to act of behalf of, and thus bind, Hartford outside of the policy. In support of this position, defendants point to the decision in *Joyner v. Harleysville*, 393 Pa. Super. 386, 574 A.2d 664 (1990). In *Joyner*, the Pennsylvania Superior Court held that a broker to whom an insured paid premiums but who failed to remit those sums to the insurer had apparent authority to act on behalf of the insurer. *Id*. at 669–70. The finding was based on circumstances where the insurer had acquiesced to the transmission of premiums through the broker, despite being aware of problems with late payments and dishonored checks. *Id*.

However, whether or not a broker has apparent authority to quote premiums or receive payments on behalf of an insurance carrier is not the same as whether a broker has apparent authority to bind the insurance carrier with regard to

representations regarding coverage. *Donegal Mut. Ins. Co., supra* at 669

(observing that the *Joyner* decision specifically noted that "the issue in this case

does not involve a broker/producer's capacity ... to make representations on behalf

of the insurer regarding substantive provisions of the policy ....") (quoting *Joyner*,

574 A.2d at 671). Thus, any attempt to extend *Joyner* to support a finding that

ACC reasonably believed that C-B had the apparent authority to bind Hartford is

limited.

   ACC contends that Pace believed ACC needed to be added to the B&S

policy. Specifically, Aziz Sahovic testified that he and Pace discussed whether to

add ACC to the B&S policy or to secure separate coverage, and that Pace

recommended adding ACC to the policy. (Doc. 31, ¶¶ 25–27). ACC argues that

Pace's present belief that the Hartford policy for B&S provides coverage to ACC

suggests its position that coverage extends to ACC is reasonable.

   Pace testified, however, that he met with the Sahovics to discuss placing

B&S's coverage with Selective, as Hartford had issued its notice of nonrenewal.

(Doc. 45, ¶¶ 24–28). Pace thereafter revised the *Selective* policy for B&S to reflect

the inclusion of ACC. Importantly, all parties concede that ACC was not to

commence operations of its business before January 1, 2009. Extending coverage

to ACC before that time would not only be curious but unnecessary. Pace's

present belief as to the extent of coverage is grounded upon the indemnity agreement which, he contends, qualifies as an "insured contract" under the policy. Having concluded that the provision provides no relief herein, the present argument is without merit.

Moreover, the Agency Agreement limits C-B's authority to act on behalf of Hartford to the extent expressly granted therein and specifies that no further power or authority is implied. (Doc. 29-8, Ex. G). It explicitly states that C-B is "an independent contractor." *Id*. Additionally, although the term "agent" is referenced throughout Hartford documents, C-B and/or Pace are also referred to as "producers." (Doc. 29-3, Ex. C-1.). Nor does the use of the term "agent" correlate exclusively to Hartford. For instance, the Notice of Non-renewal directs B&S that "[y]ou should contact your agent." (Doc. 29-10, Ex. I.). Moreover, it is well established that the mere use of the terms "principal" and "agent" do not create an agency relationship. *See Compania de Elaborados de Cafe v. Cardinal Capital Management, Inc.*, 401 F. Supp.2d 1270, 1288 (S.D. Fla.2003).

Accordingly, defendants have failed to put forth sufficient evidence to establish the existence of apparent authority.

*c. Authority by estoppel*

"Agency by estoppel" arises where the principal "by his culpable negligence in failing to supervise the affairs of his agent, allows him to exercise powers not granted to him, and so justifies others in believing he possesses the requisite authority." *Reifsnyder*, 152 A. at 100. Although defendants contend Hartford is estopped from denying coverage of equitable principles, they have no put forth evidence to carry their burden of establishing agency by estoppel by showing Hartford failed to supervise C-B or Pace or that the latter exceeded his authority. Hartford correctly observes that the allegations make out a claim for vicarious liability rather than estoppel based on the relationship between Hartford and C-B as well as the alleged negligence of C-B in failing to properly cover ACC.

However, for the reasons set forth in the foregoing analysis, it is determined that C-B and Pace were not the agents of Hartford and, further, they did nothing outside of the insurance policy to bind Hartford. An agency by estoppel claim has not been established.

Further, the record does not appear to support ACC's argument that C-B violated a duty to ACC, casting doubt on C-B's third-party negligence claim. In fact C-B obtained insurance coverage for both ACC and B&S with an effective date of January 1, 2009, which happened to be two weeks after Gonzalez'

31

accident. This fact also supports Hartford's argument that any discussions about insurance coverage for ACC prior to the accident focused on coverage effective January 1, 2009.

For the foregoing reasons, even if ACC were successful in establishing negligence on the part of C-B, such negligence cannot be imputed to Hartford.

**V. Recommendation**

For the foregoing reasons, it is respectfully recommended that Hartford's motion for summary judgment (Doc. 27) be granted and that ACC's motion for summary judgment (Doc. 30) be denied. Specifically, it is recommended that the court declare Hartford has no obligation to defend or indemnify Defendant ACC in the underlying Gonzalez action, that the Clerk of Court enter judgment in favor of Plaintiff on all claims and defenses asserted, and that Hartford be dismissed as a party to this matter. It is further recommended that the court deny ACC's motion for summary judgment, leaving only ACC's third party claims against C-B for disposition.

Signed on April 26, 2012.

MILDRED E. METHVIN
U. S. MAGISTRATE JUDGE